Paolo Castiglione, Appellant, *v.* Austro-Americana Steamship Company, Ltd., Respondent.

First Department, December 7, 1917.

Ships and shipping — common carrier — action to recover for damage to fruit by freezing while in carrier's warehouse — duty of carrier determined by bill of lading and trade custom — when question of carrier's negligence for jury — erroneous charge.

Action to recover damages sustained through the alleged negligence of the defendant steamship company in failing properly to care for two shipments of lemons. It appeared that the goods were delivered in a foreign country for transportation to New York, the bill of lading being made out to the order of the shippers and thereafter indorsed and assigned to the plaintiff who was consignee. The bill of lading among other things provided that the goods on arrival in New York were to be stored in a warehouse on the defendant's pier in a heated compartment, a certain charge per day being made by the carrier for such storage. It was also shown to be the custom of the trade that such green fruit, when received, was sold by sample at public auction and not removed by the buyer until after the sale, the goods in the interim being warehoused by the carrier.

It further appeared that the plaintiff paid said warehouse charges covering a period of ten days, but that, owing to the crowded condition of the pier, the goods were not placed in a heated compartment but in an adjoining compartment, and that in the winter season the steam in the heated compartment was turned off with a result that during the time for which storage had been paid the fruit was frozen and frost bitten

and was finally sold at a low figure owing to such defect.  Evidence examined, and *held*, that it was a question of fact for the jury to determine as to whether or not the defendant had been guilty of negligence in the care of the plaintiff's goods and also a question of fact as to whether it was guilty of negligence in shutting off the heat under the existing conditions.

In view of the terms of the bill of lading and the custom of the trade it was error for the court to charge in substance that the plaintiff might be found guilty of contributory negligence in failing to remove his goods and care for them upon their arrival.

APPEAL by the plaintiff, Paolo Castiglione, from a determination and order of the Appellate Term of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 2d day of March, 1917, affirming a judgment of the City Court of the City of New York and an order of said court denying plaintiff's motion for a new trial.

Plaintiff further appeals from the judgment and order of the City Court.

*George P. Foulk*, for the appellant.

*Charles T. Cowenhoven, Jr.*, for the respondent.

DOWLING, J.:

Plaintiff brought this action to recover the sum of $1,296 damages sustained through the alleged negligence of defendant in failing to properly care for two shipments of green lemons. One of these shipments was consigned by Salv. Leto & Co., the other by Trifiro, Termini & Company.  The former shipment consisted of 310 boxes, the latter of 554 boxes, of lemons.  Both were delivered to defendant as common carrier on December 18, 1913, at Palermo, Italy, for transportation to New York city, consigned to the respective shippers. The · bills of lading, made out to the order of the shippers, were thereafter duly indorsed and delivered to plaintiff, who was the consignee and owner of the fruit before its delivery at New York.  The bills of lading contained the following provisions:  " Taken on condition that the lemons may be discharged in New York regardless of weather;  * * *  6.— Also, that the steamer may commence discharging immediately on arrival and discharge continuously any custom of the port to the contrary notwithstanding.  Magnesite and / or

asphalt to be received by consignee day or night as fast as steamer delivers. Sulphur to be discharged into lighters which consignees are to furnish as required by the steamer, and to be received day and night as steamer delivers. The Collector of Customs of the port of discharge being hereby authorized to grant a general order for discharge immediately on arrival, and if the goods be not taken from the steamer by the Consignee directly they come to hand in unloading the steamer, the Master or the Steamer's Agent to be at liberty to enter and land the goods or put them into craft or store at the owner's risk and expense, when the goods shall be deemed delivered and steamer's responsibility ended, but the steamer and carrier to have a lien on such goods until the payment of all costs and charges incurred. * * * 18.— If during the winter season, any green fruit carried on this bill of lading is discharged at a dock fitted with heating machinery, a charge of one-third of one cent, United States currency, per package per day, will be levied on all packages, accidents to machinery etc., always excepted." The lemons in question were in good condition when received for carriage at Palermo. The steamer *Virginia* arrived at the port of New York January 6, 1914, and the lemons were discharged at the Bush Terminal Pier on the following day (7th), at Pier No. 2, leased by defendant's agent, the regular place for the discharge of defendant's cargoes. The operation of discharging was finished at noon. The custom of the trade with reference to green fruit of the character of the shipments in question is established by the evidence to be as follows: The goods are sold by sample at public auction, and not removed until after such sale; in the interim the goods are warehoused by the carrier, which provides accommodation for such purpose and charges a fee therefor, based on the probable lapse of time before the cargo can be sold. This charge is paid in advance by the consignee on the arrival of the goods, and defendant's clerk in the case at bar estimated such period at ten days, and charged plaintiff (and received from him) the sum of twelve dollars on the 310 boxes and twenty-two dollars on the 554 boxes. This is termed a " Wharfage Deposit " but defendant's agent admits it was a ten-day charge for " wharfage." What this means is storage, for the goods are placed in defendant's

warehouse and held there until removed by the purchaser immediately after the auction sale. Upon what basis the charge was computed does not clearly appear, although defendant's witness Bachman says it was fixed at one-third of a cent per box per day, which is the rate allowed by the bill of lading where in the winter season " green fruit * * * is discharged at a dock fitted with heating machinery." At such a rate, the amount charged for each of the shipments herein would pay for a fraction over eleven days of storage. The defendant, in fact, maintained a warehouse on its pier (which is covered), with four sections, known as A, B, C and D. Each section was 330 feet long by 125 feet and 45 feet high. Section B was heated by steam, but it is claimed that as the result of the arrival of two other cargoes, that section was congested, and plaintiff's goods were, therefore, placed in section A, which was not heated, but as near the heated section as they could be located, with the doors between said sections open, and the boxes were covered with tarpaulins. Section B accommodated 40,000 boxes of green fruit, and at the time of the arrival of plaintiff's goods contained about 33,000 boxes, but it is claimed no more could be put therein, as the lots belonging to different importers had to be stored and separated according to the marks, to enable the individual shipments to be reached. Defendant contends that it made public announcement to the fruit trade that it could not accommodate the cargo of the *Virginia* in the heated part of the pier because of congestion, and this notice was given to the Fruit Auction Company and the Fruit Importers Union. It gave no notice to plaintiff, claiming it did not know who was the owner of the goods, as they were consigned to the order of the shippers; this, despite the fact that the bill for freight and " wharfage " on both shipments is made out in the name of the plaintiff, which defendant claims may have been written in afterwards. After having been placed in the unheated section on January seventh (but, as has been said, as near as possible to the heated section, and with the doors between kept open), the steam heat (for which defendant paid twenty-five dollars a day) was turned off at midnight of January seventh and not again turned on until five P. M. on January twelfth. Defendant claims this was

done because the temperature was high. Meantime the temperature had in fact varied considerably. When the *Virginia* arrived on January sixth the minimum temperature was seventeen degrees and the maximum thirty-one degrees; on the seventh, on which day the discharge of cargo was completed, the respective limits were twenty-six degrees and thirty-eight degrees; on the eighth, thirty-three degrees and thirty-eight degrees; on the ninth, thirty-six degrees and forty-seven degrees; on the tenth, thirty degrees and forty-two degrees; on the eleventh, twenty-two degrees and thirty degrees; on the twelfth, ten degrees and thirty-one degrees. Defendant's witness says that it is safe to discharge lemons on a rising temperature of twenty-five degrees; plaintiff's witness says that the proper temperature to store or handle lemons is " anywheres above 30°," and that " a lemon if it is exposed long enough will freeze about twenty-six or twenty-seven." There is a difference between a frozen lemon and a chilled one; the former being completely hardened and valueless, while the latter is soft and turns black and can only be used for immediate consumption, but has some value in the market. The two shipments in question were sold at auction on January thirteenth. Preliminary thereto, thirty sample boxes were taken from the lot and examined on January twelfth, and it was found that the fruit on the sides of the boxes was frozen, while some of the fruit in the interior was chilled. As the result of their chilled and frozen condition, the lemons sold at public auction for much less than similar fruit in good condition, causing the damage for which plaintiff seeks to recover. The purchaser at the sale removed all the remaining boxes from defendant's pier on January thirteenth, some days before the ten-day period of storage expired. Upon this state of facts, a question of fact was presented for the determination of the jury, as to whether or not defendant had been guilty of negligence in the care of plaintiff's goods. Whether it called the charge for its service " wharfage " or " storage," it was equally responsible for its own negligence and for that only. Concededly, its provision for a heated warehouse for storing green fruit in the winter season was to increase the defendant's business as a carrier and it installed a heating plant particularly to receive lemons

in cold weather and to store them until they were sold at public auction. It charged a fee for that service, at a fixed rate of one-third of a cent a box per day, and the bill of lading shows that the price was for a heated dock. Whether, under all the conditions shown here, with the heated section as well filled as it could be, a rising temperature after discharging cargo and the notice given to the trade of the inability to store any lemons from the *Virginia* in the heated section, the defendant was justified in storing plaintiff's lemons in the unheated section, or was guilty of negligence in so doing, was an issue of fact. Whether, if justified in so storing them, defendant was guilty of negligence, under all the existing conditions, in allowing the steam heat to be shut off from section A for more than five days, thus leaving the green fruit in section B without heat from any source, was equally a question of fact. There seems to be no question, upon the record, that the plaintiff's lemons were frozen or chilled during this period when no heat was supplied by defendant.

But the learned trial court submitted the issue to the jury in a charge which imposed an unwarranted burden upon plaintiff and requires the reversal of the judgment herein. He said: " Now, there is another point you may consider, and that is the duty of the plaintiff in reference to the consigned goods. If he knew, and he said he did know, of the arrival of the *Virginia* on the 6th of January, and it appears that he had already paid part of the goods, at least for the 310 cases on the 2nd day of January, four days prior to the arrival of the steamer, on the 6th day of January, that there were 864 cases of these lemons on board of this ship, and he had the facility of getting the papers through the Custom House, and to then take away the goods and care for them, was he not guilty in that case of such negligence which amounted to contributory negligence and discharged the defendant no matter whether it was negligent or not.

" There is an equal duty resting upon the plaintiff, as well as the defendant; a greater duty in fact, to see to his own goods, which were then on the dock, as he knew and ought to have known, and were subjected to a temperature of from thirty-three degrees down to seventeen degrees, knowing that

the goods, under such circumstances, would naturally fail and become worthless. Wasn't it his duty, and under the law I charge you it was his duty to see to it, if he was able to do so because of the arrival here of the bill of lading and to obtain their discharge by the Government by the payment of the custom's duty, and if he was in condition to go there and take them away, gentlemen, and did not do it, he was guilty of negligence, and the plaintiff cannot recover."

This charge is based on the theory that plaintiff was bound, at his peril, to remove his goods forthwith from defendant's " dock," as soon as he learned of their arrival. There is no such rule of law applicable to the facts in this case. There is a question of fact as to when plaintiff was first in a position to claim his goods. But it is proven that the goods were stored by defendant in conformity with a well-known custom upon which both plaintiff and defendant relied and acted, by which green fruit was not to be removed from defendant's pier until its sale at public auction in the regular course, when it would be taken away at once by the purchaser at such sale. It was never contemplated by the parties that plaintiff would himself remove the goods before that time. Furthermore, defendant had charged plaintiff a sum based on a rate fixed by its own bill of lading, and for a period of time it determined for itself as reasonable, during which the goods were to be stored by defendant awaiting such sale. That charge was based on the furnishing of a heated place of storage, and such a place should have been furnished when, and as, required. Under the facts established here, plaintiff had a right to rely on defendant's exercising proper care of his goods for the period for which he had paid storage, and was under no duty to remove or care for his property till that period expired. As all the facts complained of occurred before the ten-day period had elapsed, no contributory negligence can be attributed to plaintiff, and the sole question in the case is that of defendant's negligence. The cases cited by defendant have no application to the facts established herein.

The determination of the Appellate Term and the judgment and order of the City Court will, therefore, be reversed, and a new trial ordered, with costs in all courts to appellant to abide the event.

CLARKE, P. J., LAUGHLIN, PAGE and SHEARN, JJ., concurred.

Determination appealed from and judgment and order reversed and a new trial ordered, with costs in all courts to appellant to abide event.